United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE FORD TAILGATE LITIGATION

Case No.  11-cv-02953-RS

**ORDER GRANTING FORD'S MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE THE TESTIMONY OF EXPERTS CHAMBERLAIN, PHILLIPS, LOCKE, AND HIXENBAUGH**

I.      INTRODUCTION

From 2002 through 2005, Defendant Ford Motor Company manufactured Ford Explorers, Mercury Mountaineers, and Lincoln Aviators.  These SUVs had similar designs and a similar problem:  the plastic appliqué just below the flip-glass (also known as the backlite) on the rear liftgate had a tendency to crack.  Plaintiffs Sally Nettleton, James Denning, Al Morelli, Spencer Ware, Brian Martin, and Zane Dery contend that the cracked appliqué created serious safety hazards.  They claim the crack in the appliqué allows more water and corrosive elements to come into contact with the metal parts that hold the flip-glass in place, causing the metal parts to corrode.  This corrosion, they insist, leads the metal parts to come into contact with the flip-glass, thereby causing the glass to shatter spontaneously or fall off.  According to the plaintiffs, the missing flip-glass creates an "ejection portal" through which people and objects might fly.  In addition, plaintiffs argue that pieces of the cracked appliqué can fall off the back of the car and

United States District Court
Northern District of California

1   contribute to vehicle-related road debris that clutters the roads and induces accidents.

2       Plaintiffs seek certification of three classes of all current and former owners or lessees of

3   2002-2005 Ford Explorers and Mercury Mountaineers and 2003-2005 Lincoln Aviators in

4   California, New Jersey, and Florida.  The California plaintiffs aver that Ford violated California's

5   Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770, and Unfair Competition Law

6   ("UCL"), Cal. Bus. & Prof. Code § 17200.[1]  The New Jersey plaintiffs assert claims under the

7   New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. § 56:8-2.  Dery, a Florida resident,

8   claims that Ford violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla.

9   Stat. Ann. §§ 501.201-.213.  Ford opposes class certification and also moves for summary

10  judgment on the individual plaintiffs' claims.

11      To substantiate their claims about the safety risks associated with the cracked appliqué,

12  plaintiffs offer the testimony of three experts:  Henry Chamberlain, a glazing expert; Don Phillips,

13  an automobile safety expert, and Carl Locke, Ph.D., an expert in metal corrosion.  Plaintiffs

14  further rely on the testimony of Richard Hixenbaugh, an automobile appraiser, to support their

15  claim that the cracked appliqué and its safety risks reduced the value of the cars by 15% across the

16  board.  Ford moves to exclude the testimony of all four experts.  Plaintiffs also move to exclude

17  the expert testimony of Ford's expert, Diane Wood, Ph.D., a behavioral psychologist.  Ford has

18  offered Wood's testimony in opposition to plaintiffs' motion for class certification.

19      To begin, the opinion testimony of plaintiffs' experts Chamberlain, Phillips, and Locke is

20  not admissible.  Although Chamberlain is undeniably qualified to testify about glazing and glass

21  installation, he does not possess the requisite experience, training, or education to offer opinions

22  about the cracking applique, corrosion, or the rate of cracking in the appliqués.  In addition, the

23  methods Chamberlain employed to reach his conclusions are unreliable.  Phillips's testimony also

24  lacks reliability and credibility.  Finally, although Dr. Locke is eminently qualified to discuss the

---

26  [1] In the third consolidated amended complaint, plaintiffs assert claims for relief under the Secret
27  Warranty Law, Cal. Civ. Code § 1785.90, *et seq.*  At oral argument, plaintiffs confirmed that they
    are no longer pressing their claims under the Secret Warranty Law.  Accordingly, Ford's motion
    for summary judgment is granted.

causes of corrosion, he fails to support his conclusion about the link between the cracked appliqués and a higher rate of corrosion either with evidence or with any reliable methodology. Without the testimony of these three experts about the alleged safety risks caused by the cracked appliqué, no reasonable jury could find that Ford had a duty to disclose those risks to consumers or that the cracked appliqué poses safety risks at all.  Accordingly, Ford's motion for summary judgment with respect to the individual California and New Jersey plaintiffs must be granted.

Moreover, Hixenbaugh's testimony about the universal rate of depreciation for all class vehicles is quintessential *ipse dixit*, and therefore inadmissible.  Without Hixenbaugh's testimony, plaintiffs cannot establish that Florida plaintiff Dery suffered actual damages resulting from Ford's alleged deceptive acts.  Proof of actual damages is an essential element of a FDUTPA claim, and therefore without admissible proof of actual damages, no reasonable jury could find in Dery's favor.  Thus, Ford's motion for summary judgment as to Dery's claim is granted.

Because Ford's motion for summary judgment against the individual plaintiffs is granted, plaintiffs' motion for class certification is denied as moot.  *See Thomasson v. GC Servs. Ltd. P'ship*, No. 05CV0940LABCAB, 2007 WL 2317111, at *5 (S.D. Cal. Aug. 9, 2007) ("[A]ny renewed Motion To Certify Class [is] necessarily foreclosed by the summary judgment result.").  Plaintiffs' motion to exclude Wood's testimony is also moot, and therefore denied.

## II.        FACTS AND PROCEDURAL HISTORY

### A.  The Cracked-Appliqué Problem

Between 2002 and 2005, Ford manufactured three types of four-door SUVs with the same basic tailgate, which included a rear liftgate with flip-glass that can be opened without opening the entire liftgate.  The flip-glass attaches to the body of the car at the top with two glass hinges—one on each side.  Near the upper right- and left-hand corners of the glass, there are ball stud brackets and struts, which allow the glass to be opened and closed without having to open the entire liftgate.  Maclean Decl. ¶¶10-11; Tew Decl. Ex. 3.  Underneath the flip-glass is the plastic appliqué—the subject of this lawsuit.

Ford manufactured the liftgates with the help of two outside suppliers.  Lacks Industries

produced the appliqués from acrylonitrile butadiene styrene ("ABS"), a plastic polymer.  Curtiss Dep. 25:12-16; Tew Decl. Ex. 1.  Dura Automotive assembled the liftgates before shipping them to Ford plants, where the liftgates were attached to the vehicles.  *Id.* at 24:1-17.

The appliqué is attached to a reaction injection molded ("RIM") urethane.  *Id.* at 20:5-17.  The appliqué and RIM cover the metal hardware that connects to the flip-glass and provides a nest for the vehicle's applicable logo.  Maclean Decl. ¶ 12.  Ford designed the RIM urethane with a water management system of weepholes along the bottom edge.  Dep. S. Walters 78:12-17; Tew Decl. Ex. 4.  These weepholes allow water that seeps behind the appliqué to flow through the bottom.  *Id.*  The RIM urethane is molded onto the liftgate glass and cured before the appliqué is attached to the RIM urethane with adhesive.  Curtiss Dep. 20:5-17.  The appliqué is not attached to the glass.  *Id.*  Both the RIM urethane and the flip-glass sit on top of an electro-coated steel stud plate, the mounting site for the rear wiper motor and the U-shaped striker.  Maclean Decl. ¶ 12.  The striker latches the glass to the liftgate.  To minimize contact between the stud plate and glass, Ford inserted a plastic gasket as a barrier.  Maclean Decl. ¶ 13.

The appliqué had a problem:  it had a tendency to crack down the center.  According to plaintiffs, this crack posed serious safety risks because the glass could shatter or fall off, creating an "ejection portal" through which people and objects might fly.  In addition, parts of the appliqué could fall off the car.  Plaintiffs contend that the crack in the appliqué leads to a series of events, ultimately resulting in the glass shattering.  They insist that the cracks allow more water to enter behind the appliqué and come into contact with the metal stud plate.  As water, salt, and wiper fluid flow over the stud plate, the metal components rust, weaken, and swell.  Eventually, the rusted metal parts come loose, causing the glass to come into contact with the metal.  This glass-on-metal contact then causes the flip-glass to shatter or fall off the liftgate completely.

**B.  Ford's Response to Consumer Complaints About the Cracked Appliqué**

Shortly after the cars went to market, in June 2001, Ford started receiving reports that some vehicles still at the dealerships were showing cracks in the appliqué.  Watson Dep. 42:17-22; Tew Decl. Ex. 7.  By March 2002, Ford had received 244 reports of cracked appliqués.  Tew Decl.

Ex. 10.  To get to the root of the problem, Ford contacted Lacks and Dura and urged them to investigate the cracked-appliqué problem.  Ford, Dura, and Lacks performed a variety of tests to identify the problem, including thermal expansion tests, environmental tests, facture analysis, wiper fluid tests, and slam tests.  Tew Decl. Ex. 9.  In addition, Ford initiated a Quicker Service Fix, which sets a 90-day deadline to identify effective repairs.  Tew Decl. Ex. 10.  At least one Ford employee thought many—if not all—appliqués would eventually crack.  Joseph Watson, the Plant Vehicle Team program manager, in an e-mail wrote, "We already know about the applique cracking.  This was a QSF & it was projected to see a 100% failure rate."  Tangren Decl. Ex. 9. at 5.[2]

    As a result of its testing, Ford determined that the appliqués were cracking because they were attached too firmly to the RIM, and therefore the appliqués were under pressure when they expanded and contracted in changing temperatures.  Curtiss Dep. 96:19-98:14.  Ford stopped using ABS to manufacture the appliqué and started using a different polymer, Xenoy.  *Id.* at 222:25-223:3.  Ford began producing Xenoy appliqués in November 2002, and all 2003-2005 Aviator appliqués were made with Xenoy.  Tew Decl. Ex. 17.  As of February 2003, all newly manufactured Explorers, Mountaineers, and Aviators had Xenoy appliqués.  Herline Dep. 31:15-32:17; Tew Decl. 18.  To reach the 2002 models, Ford issued a Technical Service Bulletin ("TSB"), advising technicians to replace cracked appliqués with a Xenoy appliqué.  The December 2002 TSB recommended that technicians replace the entire liftgate glass assembly.  Tew Decl. Ex. 20.  In June 2003, however, Ford issued another TSB, advising technicians to replace the ABS appliqués with Xenoy appliqués without replacing the entire liftgate glass assembly.  Bissi Dep. 67:4-13, Tew Decl. Ex. 21; Tew Decl. Exs. 22, 23.  In 2004 and 2005, Ford issued additional up-to-date TSBs for the applicable vehicles, which stated that the repairs were covered under the terms of the bumper-to-bumper warranty.  *See* Tew Decl. Exs. 25, 26, 27.  Although the Xenoy appliqué cracked at a lower rate than those made from ABS, some Xenoy

---

[2] Watson retreated from that statement at his deposition, however, and testified that the highest failure rate Ford had identified was 14%.  Tew Decl. Ex. 7 at 9.

appliqués continued to crack.  Tew Decl. Ex. 22.

In addition to receiving complaints about cracked appliqués, Ford heard from many consumers whose flip-glasses dropped or shattered.  Tew Decl. Ex. 33.  After investigating these complaints, Ford identified problems with the liftgate hinges and struts and issued a recall for 2002 and 2003 Ford Explorers and Mercury Mountaineers.  *Id.*  Ford did not find any relationship between the glass falling and cracked appliqués.  Kopeika Dep. 216:4-7, Tew Decl. Ex. 30; Herline Dep. 171:18-172:12.  Indeed, of the 25 reports of glass breakage not one report mentioned a cracked appliqué.  Watson Dep. 197:9-198:2.

**C.  The Named Plaintiffs**

1.  <u>The California Plaintiffs:  Nettleton, Denning, and Morelli</u>

Sally Nettleton purchased a used 2003 Ford Explorer in November 2003.  Nettleton Dep. 48:18-23, Tew Decl. Ex. 1.  The car had been a Hertz rental car and had travelled 21,192 at the time of purchase.  *Id.* at 44:22-45:7, 53:10-17.  The appliqué on her car cracked in February 2008, when the car had covered 92,000 miles.  *Id.* at 110:9-112:15.  Nettleton contacted the dealership to repair the car, which declined to pay the expense because the warranty had expired.  *Id.* at 111:23-112:15.  Seven years have passed since the appliqué cracked, but Nettleton has not fixed it. *Id.* at 119:24-120:7.  The appliqué has not fallen off, and the liftgate glass has not shattered.  *Id.* at 123:2-12.

In March 2004, James Denning purchased a new 2004 Ford explorer at North County Ford in Vista, California.  Denning Dep. 23:9-11; 32:16-30, Tew Decl. Ex. 2.  The appliqué on his vehicle cracked in August 2011.  At the time of purchase, the car had travelled 109,000 miles.  *Id.* at 69:8-21, 80:1-13.  Denning repaired the crack for $438.  *Id.* at 71:22-24.  The glass on the liftgate has not cracked, come loose, or fallen.  *Id.* at 103:7-22.

In September 2003, Al Morelli purchased a new 2003 Ford Explorer in California.  Morelli Dep. 102:8-18, Tew Decl. Ex. 3.  The appliqué on his Explorer cracked in August 2011, when the car had traversed 54,000 miles.  *Id.* at 52:19-25.  Morelli requested that Ford cover the cost of repair, which Ford denied because the warranty had expired.  *Id.* at 125:8-23.  Since then, Morelli

has not fixed the appliqué other than to put some "foam-type material" in the crack. *Id.* at 64:3-20.  Morelli Dep. 64:3-20.  His Explorer's flip-glass has not fallen or shattered, nor has the appliqué fallen off. *Id.* at 120:23-121:2.

     2. <u>The New Jersey Plaintiffs:  Ware and Martin</u>

  In July 2007, Spencer Ware bought a used 2004 Ford Explorer sporting 32,000 miles. Ware Dep. 31:24-32:2, 37:2-8, Tew Decl. Ex. 25.  The appliqué cracked in January 2011, and has not been fixed. *Id.* at 76:21-23, 77:14-18.  In May 2013, the rear flip-glass became dislodged and the hinges broke. *Id.* 95:9-20, 97:2-6.  Ware bought replacement hinges on e-Bay and repaired the car himself. *Id.* 97:7-98:11.

  Brian Martin purchased his new 2002 Mercury Mountaineer in August 2003.  Martin Dep. 42:13-22, Tew Decl. Ex. 26.  The appliqué on Martin's vehicle cracked sometime in the winter of 2006. *Id.* at 127:21-128:2.  When Hurricane Sandy hit New Jersey in October 2012, Martin's Mountaineer was submerged in saltwater for an extended period of time. *Id.* at 189:19-191:14. Progressive Auto Insurance, Martin's insurer, declared the vehicle a total loss, but Martin chose to keep the car. *Id.* at 194:16-195:11.  He has not repaired the cracked appliqué, and does not intend to do so. *Id.* at 147:12-15.

     3. <u>The Florida Plaintiff:  Zane Dery</u>

  In May 2008, Zane Dery bought a used 2005 Lincoln Aviator.  Dery Dep. 99:7-14, Tew Decl. Ex. 27.  At the time Dery purchased the car, he also owned a 2003 Aviator. *Id.* at 32:20-33:6.  Dery's 2003 Aviator had a crack in the appliqué, which he repaired at his own expense. *Id.* at 22:13-15, 36:1-3, 146:23-147:1.  Sometime in 2011, his 2005 Aviator developed a crack in the appliqué, but he has not bothered to fix it. *Id.* at 107:12-20.  The liftgate glass has never shattered, cracked, or come loose. *Id.* at 120:23-121:1.  The appliqué on his car has not fallen off. *Id.*

  **III.**  **FORD'S MOTIONS TO EXCLUDE EXPERT TESTIMONY**

  Plaintiffs maintain that the cracked appliqué poses numerous safety risks.  To support this contention, they rely on experts Henry Chamberlain, Donald Phillips, and Carl Locke to make the

United States District Court
Northern District of California

multiple, requisite causal connections.  First, they must prove that the crack in the appliqué accelerates the rate at which the metal components corrode.  Locke, an expert in metal corrosion, attempts to make that link by offering the opinion that the crack created a more corrosive atmosphere for the metal parts than would have existed absent the cracked appliqué.  Second, plaintiffs must show that the corroded metal parts weaken and come loose, bringing them into contact with the glass, which causes it to shatter or fall out.  Chamberlain, a glazing expert, makes this connection.  Finally, Phillips, an automobile safety expert, purports to add information about the safety hazards posed by the glass breakage in the form of occupant ejection.  Ford has moved to exclude all three, arguing that the experts are either unqualified to offer their opinions or that the opinions are unreliable.

Plaintiffs also rely on the testimony of Richard Hixenbaugh, an expert in vehicle appraisals and claims.  He opines that the cracked appliqués depreciate the value of the class vehicles by 15% across the board.  Ford argues that his testimony is similarly unreliable, and therefore should be excluded.

A. **Legal Standard**

To testify at trial as an expert, Rule 702 of the Federal Rules of Evidence requires that the witness be qualified by "knowledge, skill, experience, training, or education."  Fed R. Evid. 702.  Even if a witness is qualified as an expert in a particular field, any scientific, technical, or specialized testimony is admissible only if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based upon sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) the expert has reliably applied the principles and methods to the facts of the case."  *Id.*

Rule 702 does not permit irrelevant or unreliable testimony.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993).  Expert opinions are relevant if the knowledge underlying it has a "valid . . . connection to the pertinent inquiry."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).  Expert opinion testimony is reliable if such knowledge has a "basis in the knowledge and experience of [the relevant] discipline."  *Id.*  The

following factors inform whether to admit expert testimony:  "(1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential error rate, and (4) whether it is generally accepted in the scientific community." *Wagner v. Cnty. of Maricopa*, 673 F.3d 977, 989 (9th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94) (internal quotations omitted)). This list is not exhaustive, however, and the standard is flexible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The *Daubert* inquiry "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and other 'specialized' knowledge." *Id*.

The task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013).  Impeachment alone is not a proper basis for exclusion. *Id*. at 969.  An expert's opinion is always assailable through cross-examination. *Daubert*, 509 U.S. at 596.  *Daubert* analysis instead focuses on the principles and methodology employed, not the conclusions reached by the expert.  *Id*. at 595.  Ultimately, the purpose of the assessment is to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the trier of fact.  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho*, 526 U.S. at 157.[3]

### B. **Henry Chamberlain**

Plaintiffs retained Chamberlain to explore the impact of the cracked appliqués on the flip-glass.  Chamberlain has extensive experience in the auto glazing and glass-installation industry.  To begin his inquiry, Chamberlain looked at photos of cracked tailgates.  He did not form the hypothesis that led to his conclusions until he examined the shattered flip-glass and liftgate on a 2005 Lincoln Aviator in Toronto, Canada.[4]  Chamberlain noticed that the metal components of the

---

[3] Although plaintiffs advocate for an analysis "tailored" to the class-certification standard, they concede that *Daubert* dictates the analysis necessary for a motion to exclude expert testimony in the context of a motion for summary judgment.

[4] Ford Explorers, Mercury Mountaineers, and Lincoln Aviators sold in Canada are not part of the

liftgate were corroded.  Fracture patterns on the glass suggested "that [the] fracture originated at the right end of the striker plate[.]"  Chamberlain Report ¶ 6.1.4.  "The appliqué was fractured directly behind the most corroded part of the plate[.]"  *Id.* ¶ 6.1.6.  Based on these observations, Chamberlain developed a theory that the corrosion of the metal parts caused the flip-glass to break.  Chamberlain and his assistant collected eighty-seven liftgates from salvage yards in Missouri, Kansas, and Nebraska.  Of the eighty-seven liftgates he collected, 67.8% had cracked appliqués.  Many of the liftgates with uncracked appliqués had replacement appliqués instead of the original.  Based on these observations, Chamberlain concluded that 94.3% of the original appliqués from the collected liftgates had cracked.

To test his theory that the glass breaks were ascribable to corrosion of the metal parts, Chamberlain ran four tests.  First, he continuously ran wiper fluid and water over the stud plate for two months.  Second, he removed the metal studs from the stud plate so that the wiper arm was the only attachment point for the wiper and glass after which he ran the wiper blade in wet and dry conditions.  Third, Chamberlain ran slam tests on the liftgate by setting a pneumatic actuator to open and close the flip-glass multiple times with different levels of force.  Fourth, he replaced the stud plate with rusty metal flakes and chips and disengaged the studs to mimic a highly corroded plate before manually opening and closing the liftgate repeatedly.  With one exception, the glass did not shatter during any of these tests.  Chamberlain adjusted the procedure for the wiperblade test by lightly bumping the wiper motor assembly "to stimulate lateral forces acting on dangling assembly in actual use."  Chamberlain Aff. ¶ 59.  This change caused the glass to chip, and Chamberlain stopped the motion to preserve the chipped glass as evidence.

Chamberlain also developed a theory linking the corrosion of the metal parts to glass shattering called "rust jacking."  He theorizes that the metal brackets swell when they corrode, which puts pressure on the flip-glass and causes it to shatter.  According to Chamberlain, rust jacking also affects the liftgate latch such that it opens spontaneously.

proposed class.

United States District Court
Northern District of California

Based on these tests and observations, Chamberlain offered five opinions, which plaintiffs seek to admit:  (1) cracked appliqués "cause an uncommonly high incidence of backlite breakage . . . and occasionally cause the backlites to come open while the vehicles are being driven"; (2) "the corrosion of the thru-bolt brackets is inherently progressive and, ultimately, universal . . . due to inevitable appliqué fracture and detachment"; (3) the design of the appliqués is "inherently defective" because of the high number of cracked appliqués in his sample; (4) "the design of the backlite assemblies constitutes a safety feature defect"; and (5) the striker, which latches the liftgate closed, loses retention, which renders the vehicle inoperable.  Chamberlain Report ¶¶ 2.1-2.5.  Ford contends that these conclusions fall outside of Chamberlain's expertise and are based on unreliable methods.

Even the most qualified expert cannot offer any opinion on any subject; the expert's opinion must be grounded in his or her personal "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Ford concedes that Chamberlain is eminently qualified to testify about glass installation and glazing.  Undoubtedly, he is.  The trouble arises from the fact that Chamberlain has offered numerous opinions about the design of the appliqués which are not made from glass; corrosion of metal parts; the safety features of cars; and the rate at which appliqués crack, in general.  Each of these topics is outside of Chamberlain's glazing and glass expertise.  Thus, he cannot opine about whether the metal components—including the thru-bold brackets and stud plates—corrode and fail.  Nor may he offer opinions about striker retention.

Ford also challenges Chamberlain's qualifications to offer statistical opinions.  During the course of Chamberlain's research, he collected eighty-seven liftgates from salvage yards.  He recorded his observations and expressed those observations in terms of percentages.[5]  Ford challenges the admissibility of these so-called "statistical opinions" on the basis that Chamberlain is not a statistician.  While Chamberlain does not have extensive statistical training, he is not offering statistical opinions; he has merely described his observations in terms of percentages.

---

[5] For example, Chamberlain observed that 67.8% of the appliqués on the liftgates were cracked. Chamberlain Report ¶ 6.2.1.

United States District Court
Northern District of California

The mathematics required to report those observations is elementary and well within a layman's skillset. Chamberlain may not, however, use his observations about the eighty-seven liftgates to opine about how many class vehicles have the cracked appliqué. His sample size is very small and unrepresentative of vehicles that are still functioning and on the road. Furthermore, any projections Chamberlain makes about the total number of vehicles with cracked appliqués would require more advanced statistical modeling—a skill that he does not possess. Thus, Chamberlain does not have the qualifications to testify about the appliqués' failure rate, in general.

Ford also questions the reliability of the methods that Chamberlain used to form his opinions. The most critical problem with Chamberlain's proposed testimony is that he has not been able to provide a causal nexus between the crack in the appliqué and corrosion or glass shattering. Although an expert witness need not show precisely how an act or event causes an injury, there must be "sufficiently compelling proof that the [event] must have caused the damage somehow." *Daubert*, 43 F.3d at 1314. "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

There are numerous problems with Chamberlain's methods. To start, Chamberlain did not compare the functionality of liftgates with cracked appliqués to those without cracked appliqués. Without that comparison, there is no basis to conclude that the crack in the appliqué caused the glass to shatter, stud plate to rust, or striker to fail. Second, when Chamberlain performed tests that mimic realistic car use, the glass did not shatter. Indeed, Chamberlain caused the glass to chip only after changing the testing procedure to mimic a lateral load on the wiper motor while also opening and closing the glass. This test does not simulate real-world experience—people do not open and close their liftgates while driving let alone while making sharp turns. In addition, liftgates from salvage yards, which have sat for long periods of time and collected debris and moisture, are not representative of vehicles still in use. Because there is no reasonable relationship between Chamberlain's test and realistic car use, his opinions about the relationship between the corroded components and glass shattering are not admissible.

1    In sum, the bulk of Chamberlain's opinions pertains to subject matters outside of his

2  considerable expertise in glazing and glass installation, and therefore those opinions are

3  inadmissible.  Moreover, even when Chamberlain offers opinions about the glass components of

4  the class vehicles, he does not ground those opinions in reliable testing or reasonable methods.

5  Most critically, however, Chamberlain never conducted any tests or made any observations that

6  could permit him to find a causal relationship between a crack in the appliqué and glass breakage.

7  These unsupported and unqualified opinions are not admissible.  Chamberlain's testimony must

8  therefore be excluded.

9    C.  **Carl Locke, Ph.D.**

10   Carl Locke, Ph.D., plaintiffs' corrosion expert, is qualified to testify about how metal parts

11  in cars corrode over time.  What is doubtful, however, is whether he can testify about the

12  connection between cracked appliqués and an increased rate of corrosion.  Locke has offered the

13  following conclusions:  (1) "[t]he crack in the appliqués creates a greater level of corrosive

14  atmosphere for [the metal] parts to corrode (particularly the bracket and bolts) than would exist if

15  the appliqué was intact and forming a barrier to water intrusion as originally designed[]"; (2)

16  corrosion to the metal parts causes the "mounting arrangements" to come loose and move about

17  and swell; (3) this swelling "can result in pressure being applied to the glass to which it is bolted"

18  and could "possibly affect the glass in a deleterious manner."  Locke Report ¶¶ 53-55.  In addition,

19  Locke suggests four available options that could reduce the corrosion to the metal parts.  He bases

20  these conclusions on observing six liftgates that Chamberlain collected from junkyards and

21  Chamberlain's experiments.  In particular, Locke focused on the water-exposure test during which

22  Chamberlain continuously fed water and wiper fluid over the metal parts for a period of two

23  months.[6]

24   Locke's conclusions are not reliable because he offers no support for his conclusion that

25  there is a causal connection between the crack in the appliqué and a faster rate of corrosion.

26

27  ───────────────────
[6] Locke could not remember if the metal bolt was new or used.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Locke never looked at a class vehicle without a cracked appliqué to compare the corrosion of

2   those metal parts and the crack.  Nor did he observe how the water flows under an uncracked

3   appliqué and compare that to the scenario presented with a cracked appliqué.  Without that

4   information, he simply does not have any basis to form the causal link between the cracked

5   appliqué and the corroded metal parts he observed.  Plaintiffs devote the majority of their

6   opposition brief referring back to the (admittedly) permissive standard for advancing expert

7   testimony and impugning the credibility of Ford's expert witness.  However, they offer no

8   citations to Locke's deposition or anywhere else that would permit Locke to reach his conclusions

9   about the causal link between the defective appliqué and the corroded metal parts.

10        In addition, Locke offers opinions about the pervasiveness of the cracking problem, the

11   purpose of the appliqué, and the impact of corrosion of metal parts on glass.  These topics are

12   outside the scope of his expertise, which is limited to the causes and prevention of metal

13   corrosion.  Ford's motion to exclude Locke's testimony must therefore be granted.

14        D.  **Don Phillips**

15        Plaintiffs have offered the testimony of Donald Phillips, an automotive-engineering

16   consultant.  He asserts that the crack in the appliqué presents the following safety hazards:  (1) the

17   latching mechanism in the liftgate is defective because the metal corrodes after exposure to

18   moisture, which is the result of the cracked appliqué; (2) the flip-glass has a "propensity" to "open

19   on its own"; (3) the flip-glass has a "propensity" to "shatter spontaneously"; (4) when the flip-

20   glass opens or shatters there is "a complete loss of the occupant containment properties of the rear

21   flip-glass"; (5) losing the "containment properties" of the flip-glass violates Federal Motor Vehicle

22   Safety Standard ("FMVSS") 205; the design of the rear flip-glass, metal latches, and metal

23   brackets "failed to minimize the possibility of occupant ejection"; (6) the risk of occupant ejection

24   is "inherent in all vehicles"; and that "Ford knew or should have known" of the safety risks posed

25   by the cracking appliqué, defective metal latches, and shattering glass.  Phillips Expert Report ¶

26   45.  Ford contends that Phillips is not qualified to offer expert opinions about these alleged design

27   defects or the meaning of FMVSS 205.  In addition, Ford argues that Phillips did not base his

28

1    opinions on reliable methods as they rest entirely on dubious experiments by Chamberlain and

2    Locke, with Phillips conducting no independent research or testing.

3           As an initial matter, Phillips is not qualified to interpret the meaning of the FMVSS.  The

4    FMVSS are federal regulations, which courts—not jurors or experts—must interpret.  *Bammerlin*

5    *v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning of federal

6    regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a

7    question of law, to be resolved by the court.").  Even if Phillips could offer his interpretation of the

8    FMVSS, however, plaintiffs did not even respond to this point, thereby conceding it.  *See e.g.*,

9    *Ardente, Inc. v. Shanley*, No. C 07-4479 MHP, 2010 WL 546485, at *6 (N.D. Cal. Feb. 10, 2010)

10   ("Plaintiff fails to respond to this argument and therefore concedes it through silence.").

11          Phillips is a licensed mechanical engineer in Georgia, Tennessee, Mississippi, South

12   Carolina, Alabama, and Missouri.  He holds a B.S. in mechanical engineering and an M.B.A.  He

13   has attended programs about automotive glazing and design, which included discussions about the

14   occupant-containment properties of automotive glass.  Phillips has published an article entitled

15   "High Speed Rotational Testing of Laminated Side Glazing for Occupant Containment" about

16   how the glazing materials and framing can contain occupants during a high-speed rollover.

17   Although that paper addressed the occupant containment properties of side windows, that fact goes

18   to the weight of Phillips's opinion, not his expertise.  Phillips appears to be at least moderately

19   qualified to offer opinions about the safety features of cars, the containment properties of

20   automotive glass, and the risks posed by faulty or missing glass.  However, nothing on Phillips's

21   résumé suggests that he has any experience related to the design of backlite latches, corrosion of

22   metal parts, or the causes of glass shattering.  Thus, he is not qualified to offer opinions about the

23   causes of flip-glass shattering, whether the latch is defective, or the corrosion of the metal parts.

24          An even more significant problem with Phillips's proposed testimony is that he does not

25   back up his opinions with reference to any meaningful testing, literature, or comparisons.  *See*

26   *Daubert*, 509 U.S. at 593–94.  Phillips's report consists entirely of excerpts from plaintiffs'

27   declarations and references to the unsupported conclusions of his fellow designated experts.  He

28

United States District Court
Northern District of California

did not conduct any testing to determine whether people could actually be ejected from the vehicles in the event that the flip-glass shatters or account for whether someone is wearing a seatbelt.  Nor does he cite any scientific reports or evidence to corroborate his conclusions or even suggest that other scientists in the community would accept them.  There is absolutely nothing in his report or deposition bolstering the credibility or reliability of his conclusions.  Thus, his expert report and testimony must be excluded.

E. **Richard Hixenbaugh**

Plaintiffs retained Richard Hixenbaugh to testify about how much the cracked appliqué and the alleged safety risks diminished the value of the vehicles acquired by the putative class. Hixenbaugh has been an automobile appraiser for twenty-two years.  He is also certified in collision damage analysis by the Institute of Automotive Service Excellence and is a member of the Society of Automotive Engineers. *Id*.  Through the course of his career, Hixenbaugh has appraised 20,000 vehicles and performed diminution-of-value analysis for 10,000 others.  Ford does not dispute that Hixenbaugh is qualified to offer expert opinions about the value of vehicles or diminution of value, in general.  In this case, however, Ford challenges the reliability of Hixenbaugh's method for calculating the diminution in value for all putative class vehicles.

To form his opinion, Hixenbaugh reviewed the complaint, reports by plaintiffs' experts, the named plaintiffs' declarations, affidavits of putative class members, consumer complaints about the cracked appliqué, online consumer complaints, and his personal observations.  He concluded that the cracked appliqué and attendant safety risks reduce the value of all class vehicles by 15%.

The key problem with Hixenbaugh's proposed testimony is that he has not actually described any methodology used to reach that conclusion.  He does not cite to any data or sales prices of vehicles with similar alleged safety risks.  Indeed, according to Hixenbaugh, the best method for formulating an accurate estimate of a diminution in value is to find comparators— safety risks of similar severity to those associated with the cracked appliqué.  Yet, Hixenbaugh performs no such comparison or analysis.  When asked for comparisons to vehicles with collision

damage that had been repaired and would support a 15% diminution in value estimation,

Hixenbaugh vaguely responded, "[s]omewhere in the moderate to high moderate range, you know,

with some structural damage."  Hixenhaugh Dep., 189:4-190:2.  "[N]othing in either *Daubert* or

the Federal Rules of Evidence requires a district court to admit opinion evidence which is

connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S.

136, 146 (1997).  Thus, despite Hixenbaugh's extensive experience as a vehicle appraiser, his

opinions in this case are not admissible.  Ford's motion to exclude his testimony must therefore be

granted.

## IV.   FORD'S MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

A party is entitled to summary judgment when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The party who seeks summary judgment bears the initial responsibility of identifying an absence

of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the

moving party satisfies this initial burden, the non-moving party must present specific facts

showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

"Only disputes over facts that might affect the outcome of the suit under governing law" are

material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue exists if the

non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in

the light most favorable to that party, could resolve the material issue in his or her favor.  *Id.* at

248-49.

### B.  The California Plaintiffs' Claims

#### 1.  Consumers Legal Remedies Act ("CLRA")

Ford moves for entry of summary judgment on all named California plaintiffs because

Ford did not have a duty to disclose that the appliqué tends to crack.  In addition, Ford asserts that

no reasonable jury would find that Denning would have seen a disclosure about the cracked

appliqué.  Finally, Ford contends that Morelli does not have standing to pursue a CLRA claim

United States District Court
Northern District of California

1   because he did not buy his car primarily for personal, family, or household purposes.

2   As explained below, plaintiffs have produced sufficient evidence to conclude that Morelli

3   was a "consumer" within the definition of the CLRA, and therefore has standing to pursue a claim.

4   However, no reasonable jury could conclude that Ford had a duty to disclose to consumers that the

5   appliqués tended to crack.  Accordingly, Ford's motion for summary judgment is granted with

6   respect to the California plaintiffs' individual CLRA claims.  Because Ford had no duty to

7   disclose the alleged defect, there is no need to address whether a reasonable jury would find that

8   the plaintiffs' relied on omitted information about the cracked appliqué or whether plaintiffs can

9   establish entitlement to restitution.

10          **a.  Standing:  Morelli**

11          Claims for relief under the CLRA are available to "consumers," which the statute defines

12   as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal,

13   family, or household purposes."  Cal. Civ. Code § 1761(d).  "Goods" are "tangible chattels bought

14   or leased for use primarily for personal, family, or household purposes."  *Id.* § 1761(a).  Ford

15   challenges Morelli's right to bring suit under the CLRA on the basis that Morelli uses his vehicle

16   for business purposes, and therefore did not purchase the car *primarily* for personal use.  "At the

17   summary judgment stage, the district court must ask itself whether 'a fair-minded jury' could find

18   that the claimant had standing on the evidence presented."  *United States v. $133,420.00 in U.S.*

19   *Currency*, 672 F.3d 629, 638 (9th Cir. 2012).

20          Morelli uses his car in connection with his job as a property manager and real estate broker

21   and takes tax deductions for depreciation of the vehicle and all mileage related to business trips.

22   These facts suggest that Morelli intended to use the vehicle for commercial purposes at least

23   partially.  However, Morelli testified the car is his family car and that he considered the car's

24   features of benefit to his family when making the purchase.  Thus, there is sufficient evidence

25   from which "a fair-minded jury" could conclude that Morelli purchased the car "primarily for

26   personal, family, or household purposes," and he therefore has standing.  Cal. Civ. Code §

27   1761(d).

28

United States District Court
Northern District of California

### b.  Duty to Disclose

The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a).  "Conduct that is likely to mislead a reasonable consumer' violates the CLRA."  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012) (quoting *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680) (2006)).  A manufacturer is not liable for every failure to disclose a design defect; the duty to disclose arises when the omission is "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose."  *Daughtrey v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 835 (2006).  To prevail, plaintiffs must demonstrate that Ford had knowledge of a safety defect at the time of sale.  *Hensley-Maclean v. Safeway, Inc.*, No. CV 11-01230 RS, 2014 WL 1364906, at *7 (N.D. Cal. Apr. 7, 2014).

The CLRA obligates manufacturers to disclose information in four circumstances:  "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."  *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 987 (N.D. Cal. 2010) (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997)).  Plaintiffs do not allege that they and Ford had a fiduciary relationship, and therefore they must show that Ford failed to disclose material information.  *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1077 (C.D. Cal. 2014).  "[F]or [an] omission to be material, the failure must still pose safety concerns."  *Wilson*, 668 F.3d at 1143 (internal alterations and quotation marks omitted).[7]  The safety concern posed by the defect "must be something more than insignificant."

---

[7] Plaintiffs and Ford disagree about whether the CLRA requires disclosure of safety defects that the manufacturer should have known about, or whether the CLRA's disclosure requirement is limited to defects about which the manufacturer actually knew.  Plaintiffs rely on the following passage from *Lingsch v. Savage*, 213 Cal. App. 2d 729, 735 (1963):  "It is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a

United States District Court
Northern District of California

*Avedisian*, 43 F. Supp. 3d at 1078.

Plaintiffs argue Ford's failure to inform those purchasing the vehicle that the appliqué had a tendency to crack was a material omission because they should have known the appliqué might cause various safety hazards.  For a reasonable jury to find that the cracked appliqué posed significant safety risks, it must reach the following three conclusions:  (1) the cracked appliqué causes moisture to come into contact with the steel components of the liftgate at a higher rate; (2) the extended exposure to the moisture corrodes the stud plate and bolts; and (3) the metal parts fail, which brings them into contact with the glass and causes the glass to shatter.  Moreover, the jury would have to find that Ford could have identified this safety risk had it attempted to determine whether there is a causal connection between the cracked appliqué and problems with the flip-glass.  That is a tall order, and plaintiffs have not provided sufficient evidence to support their theory—particularly as it rests almost entirely on the inadmissible opinions of Chamberlain, Locke, and Phillips.

In addition, the jury would have to find that the cracked tailgate causes pieces of the appliqué in whole or in part to come completely unattached from the car.  Plaintiffs contend that the detaching appliqué is a safety hazard because it creates vehicle-related road debris.  However, plaintiffs have not demonstrated that the potential for the appliqué to detach is an *unreasonable* safety hazard.  Indeed, plaintiffs' safety expert, Gerald Forbes, acknowledged that parts may break off of all vehicles of all makes and models.  Moreover, vehicle-related road debris is the cause of less than one-percent of all vehicle crashes.  Thus, plaintiffs cannot show that the cracking appliqués are unreasonably dangerous.  Finally, plaintiffs cannot and do not provide any evidence establishing that falling appliqués have caused any crashes.

Plaintiffs have not produced enough evidence from which a reasonable jury could find that the cracked appliqué creates safety risks.  Without that proof, plaintiffs' cannot show that

duty to disclose them to the buyer."  They ignore, however, that the *Lingsch* court was not interpreting the provisions of the CLRA.  Thus, *Lingsch* has limited persuasive value.  Ultimately this debate is academic here because plaintiffs have not produced evidence that there were, in fact, safety risks associated with the cracked appliqué.

1    information about the cracked appliqué was material.  Ford does not have a duty to disclose

2    immaterial information under the CLRA, and so Ford is entitled to summary judgment.

3         2.   UCL Claims

4         Ford contends that none of the California plaintiffs' claims under the Unfair Competition

5    Law ("UCL"), Cal. Bus. & Prof. Code § 17200, are legally cognizable.  "The UCL prohibits

6    business acts that are (1) fraudulent, (2) unfair, or (3) unlawful."  *Smith v. Ford Motor Co.*, 749 F.

7    Supp. 2d 980, 996 (N.D. Cal. 2010) (citing *Daugherty*, 144 Cal. App. 4th at 837-39).  Plaintiffs

8    aver claims under all three prongs.  Ford seeks summary judgment under each prong and also

9    contends that Denning and Nettleton cannot demonstrate they relied upon Ford's alleged omission

10   in any event.  Because no reasonable jury could find that Ford's practices were fraudulent, unfair,

11   or unlawful, there is no need to address whether Denning and Nettleton relied on the omitted

12   information in making their purchases.

13        "The standard for determining whether a representation is "fraudulent" under the UCL

14   applies equally to claims arising under the CLRA."  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App.

15   4th 1342, 1382 (2012).  Thus, because no reasonable jury could find that Ford violated the CLRA,

16   plaintiffs similarly cannot show that Ford's practices were fraudulent.

17        Indeed, the unlawful prong of the UCL "borrows violations of other laws and makes those

18   unlawful practices actionable under the UCL."  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th

19   1342, 1383 (2012) (internal quotation marks and alteration omitted).  In their Third Consolidated

20   Amended Complaint ("TCAC"), plaintiffs aver that Ford's practices were unlawful because it

21   violated the CLRA, the Magnuson-Moss Warranty Act, and breach of express warranty.  TCAC ¶

22   337.  This court dismissed all but the CLRA claims with prejudice.  Nettleton's CLRA claim was

23   also dismissed with prejudice.  Thus, only Denning and Morelli have potentially viable CLRA

24   claims.  However, because no reasonable jury could conclude that Ford violated the CLRA,

25   Denning and Morelli cannot demonstrate that Ford's practices were unlawful.

26        "In consumer cases arising under the UCL, a business practice is 'unfair' if:  (1) the

27   consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to

28

United States District Court
Northern District of California

1    consumers or competition; and (3) the injury could not reasonably have been avoided by

2    consumers themselves." *Klein*, 202 Cal. App. 4th at 1376.  Generally, whether a practice is unfair

3    is a question of fact.  *Id.*

4        Plaintiffs contend that Ford unfairly withheld information about the safety risks posed by

5    the cracked appliqué.  As discussed above, plaintiffs have not presented sufficient evidence to

6    connect the defect (the cracked appliqué) to safety risks.  As such, Denning's, Nettleton's, and

7    Morelli's UCL claims under the UCL's unfair prong also fail.

8    **C.  The New Jersey Plaintiffs' Claim:  Consumer Fraud Act ("CFA")**

9        Plaintiffs argue that Ford is liable for violations of the CFA for two separate, distinct

10   reasons.  First, they contend that Ford had a duty to disclose to consumers information about the

11   cracked appliqué.  Second, they insist that Ford manipulated the terms of the warranty to avoid

12   paying to repair the cracked appliqués.  Both theories fail, and therefore Ford is entitled to

13   summary judgment with respect to the individual New Jersey plaintiffs' claims.

14       Those plaintiffs, Ware and Martin, aver that Ford's failure to disclose information about

15   the defects in the appliqué was a violation of the CFA.  They offer two theories of liability.  First,

16   they contend that Ford had a duty to tell them the appliqué had a tendency to crack because it

17   poses safety risks.  Second, they argue Ford intentionally limited the scope and duration of the

18   warranty to avoid paying the cost of repairing cracked appliqués.

19       The CFA prohibits "unconscionable commercial practice[s], deception, fraud, false

20   pretense[s], false promise[s], misrepresentation[s], or the knowing, concealment, suppression, or

21   omission of any material fact" from advertisements.  N.J. Stat. Ann. § 56:8-2.  "Defects that arise

22   and are addressed by warranty, at no cost to the consumer, do not provide the predicate 'loss' that

23   the CFA expressly requires for a private claim under the CFA."  *Thiedemann v. Mercedes-Benz*

24   *USA, LLC*, 872 A.2d 783, 794 (2005).  In addition, "the failure of a manufacturer or seller to

25   advise a purchaser that a part of a vehicle may breakdown or require repair after the expiration of

26   the warranty period cannot constitute a violation of the CFA."  *Perkins v. DaimlerChrysler Corp.*,

27   890 A.2d 997, 1004 (N.J. App. Div. 2006).  "Thus, unless a defendant manufacturer knows with

28

United States District Court
Northern District of California

1    certainty that a product *will* fail, it does not violate the NJCFA by failing to inform its consumers

2    of the *possibility* of failure."  *Alban v. BMW of N. Am., LLC*, No. CIV 09-5398 DRD, 2010 WL

3    3636253, at *10 (D.N.J. Sept. 8, 2010) (emphasis in original).  The New Jersey Court of Appeals

4    left open the possibility that, in "circumstances in which safety concerns might be implicated," a

5    manufacturer or seller may be liable for defects that manifest after the warranty expires, but

6    expressly declined to offer its view.  *Perkins*, 890 A.2d at 1004.

7        Even if the CFA requires disclosure of safety defects, however, plaintiffs' claims must fail

8    because they cannot show the cracked appliqué poses safety risks.  Thus, plaintiffs have not

9    produced evidence from which a reasonable jury could conclude that Ford had a duty to disclose

10   the alleged defect.

11       Plaintiffs' second argument is that Ford intentionally limited the terms of the warranty to

12   avoid paying to repair the cracked appliqués.  To prevail on this theory, plaintiffs must present

13   evidence showing that (1) all or substantially all of the appliqués on the class vehicles were

14   defective; (2) Ford knew that the appliqués were certain to crack; and (3) Ford limited the duration

15   or terms of the warranty agreement in an effort to avoid the cost of repairs.  *Alban v. BMW of N.*

16   *Am., LLC*, No. CIV 09-5398 DRD, 2010 WL 3636253, at *11 (D.N.J. Sept. 8, 2010).

17       Plaintiffs have not presented any evidence that creates a triable issue of fact to establish the

18   first element.  Ford was certainly aware that the appliqués on the early models of the class vehicles

19   were cracking.  In fact, Ford assigned workers to address the problem and identified the potential

20   cause:  weak plastic and rigid adhesive.  Plaintiffs rely on a single email from a Ford employee

21   who said that he expected a 100% failure rate.  That email has negligible probative value,

22   however, because the author did not have a basis to make that statement and all other documents

23   suggest that Ford expected a significantly lower failure rate.  While Chamberlain's conclusion that

24   68% of the appliqués would crack is unreliable and inadmissible, it is worthy of note that even

25   plaintiffs' expert alights on a percentage significantly less than one-hundred percent.  Thus,

26   plaintiffs have not shown that all or substantially all of the class vehicles were defective.

27       Even if Ford knew that most of the appliqués would eventually crack, however, plaintiffs

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  have not presented evidence that Ford intentionally limited the scope of the warranty to avoid

2  paying the cost to fix the problem.  They do not even try to identify where in the record there is

3  evidence of manipulation.  The best they offer is that Ford changed the procedure for fixing the

4  cracked appliqué from replacing the whole tailgate to replacing only the appliqué.  They suggest

5  that Ford opted for this less-expensive fix in order to save money, which they contend is

6  circumstantial evidence of Ford's intent to limit the scope of the warranty.  This is a weak proffer,

7  at best, and Ford offers a convincing counter theory:  Ford did not initially know how to replace

8  the appliqué without removing the whole liftgate, and once Ford figured out a better way to

9  accomplish the same task, it changed course.  Thus, no reasonable jury could conclude that Ford

10  manipulated the terms of its warranty to avoid paying to repair a known defect.  Ford is entitled to

11  summary judgment.

12  **D. The Florida Plaintiff's Claim:  Florida Deceptive & Unfair Trade Practices Act**

13       **("FDUTPA")**

14       Ford offers two reasons to enter summary judgment in its favor on Florida plaintiff Zane

15  Dery's claim under the FDUTPA.  First, Ford argues that Dery cannot prove the alleged omission

16  caused actual damages or that the omission was material in that Dery knew about the defect before

17  he purchased the car.  Second, Ford challenges Dery's ability to prove actual damages because

18  Hixenbaugh's expert testimony about the diminution in value is unreliable.

19       The FDUTPA "has three elements: (1) a deceptive act or unfair practice; (2) causation; and

20  (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. Dist. Ct. App.

21  2008).  "To prove an unfair trade practice, the class must prove that the injury caused by the

22  allegedly unfair trade practice could not have been reasonably avoided by the consumers."

23  *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. Dist. Ct. App. 2014).  "The

24  measure of actual damages is the difference in the market value of the product or service in the

25  condition in which it was delivered and its market value in the condition in which it should have

26  been delivered according to the contract of the parties." *Rollins, Inc. v. Butland*, 951 So. 2d 860,

27  869 (Fla. Dist. Ct. App. 2006) (internal quotation marks omitted).  Consequential damages, such

28

as repair costs, are not recoverable under the FDUTPA. *Id.* at 870.

The only evidence Dery offers to establish his actual damages is Hixenbaugh's testimony, which is not admissible. As such, Dery cannot prove actual damages, and Ford is entitled to summary judgment. Because Dery does not have evidence of actual damages, there is no need to decide whether Ford's alleged deceptive practices caused him injury.

## V.    CONCLUSION

For the above-stated reasons, Ford's motions to exclude the testimony of experts Chamberlain, Locke, Phillips, and Hixenbaugh are granted. Because plaintiffs cannot prove that Ford had a duty to disclose information about the cracked tailgate problem or actual damages, Ford's motion for summary judgment is granted with respect to the California, New Jersey, and Florida plaintiffs' claims. The resolution of Ford's motion for summary judgment renders plaintiffs' motion for class certification moot, and therefore it is denied.


**IT IS SO ORDERED**.


Dated:  November 25, 2015

_____
RICHARD SEEBORG
United States District Judge